IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| HARRY D. MARTIN, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 1:12-cv-00162 JFC |
| SNAP-TITE, INC., JOHN S. CLARK, GEORGE P. CLARK AND GARY L. CLARK, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**CONTI, Chief District Judge**

**I. Introduction**

This case involves breach of contract and unjust enrichment claims brought by plaintiff Harry D. Martin ("Martin") against defendants Snap-tite, Inc. ("Snap-tite"),[1] John S. Clark, George P. Clark and Gary L. Clark (collectively, the "Clarks"). Martin asserts that he provided the Clarks with extensive management consulting services from December 2008 to April 2012 for which he was never compensated. (ECF No. 7 ¶ 29).

Pending before the court is the Clarks' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 31). Upon consideration of the parties' submissions and because there was an express contract for the services provided by Martin, the Clarks' motion will be granted.

---

[1] Martin voluntarily dismissed defendant Snap-tite from the lawsuit on May 31, 2013. (ECF No. 12).

## II. Factual Background and Procedural History[2]

Martin was licensed to practice law in Pennsylvania for forty-seven years until retiring at the end of 2004. (ECF No. 38-1 ¶ 2). From the early 1960s until his retirement, Martin practiced with the law firm of Elderkin, Martin, *et al.* (the "Elderkin Firm"). (ECF No. 38-1 ¶ 3). From his education and years of practice, Martin developed expertise in the fields of corporate law, business law, mergers and acquisitions, tax, commercial real estate and other specialties. (ECF No. 38-1 ¶ 4).

Snap-tite is a manufacturing business located in Erie County, Pennsylvania, and at all times relevant to the instant action, was privately owned and the majority shareholders were members of the Clark family. (ECF No. 38-1 ¶ 5; ECF No. 42 ¶ 2). For several years prior to 1965, Martin was Snap-tite's primary legal counsel. (ECF No. 33-1 at 9, 21, Martin Dep. 33-35, 82-83). In 1965, Martin became a member of Snap-tite's Board of Directors (the "Board"). (ECF No. 42 ¶ 3). Between 1965 and 2004, Martin, through the Elderkin Firm, regularly billed Snap-tite for the legal work he performed for Snap-tite and Snap-tite paid those bills. (ECF No. 42 ¶ 8). During this same time frame, Martin also represented members of the Clark family, including the Estate of George Clark. (ECF No. 42 ¶ 5).

In the mid-2000s, the Board formed a long range planning committee (the "Planning Committee"), which originally included the three Clark brothers (the inside directors), and Zack Savas ("Savas"), David Nevins ("Nevins") and Martin (the outside directors). (ECF No. 42 ¶¶ 25-26). Each member of the Planning Committee was also a member of the Board. (ECF No. 42 ¶ 27). After the death of George Clark, the Clarks decided they wanted to begin considering

---

[2]The factual background is derived from the Combined Concise Statement of Material Facts (ECF No. 42), undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

selling Snap-tite. (ECF No. 42 ¶ 24). The purpose of the Planning Committee was to prepare Snap-tite for sale, and Martin acknowledged that this committee was created "to sharpen up Snap-tite for eventual sale." (ECF No. 42 ¶ 31).

In 2008, Snap-tite engaged Schneider Downs to act as a broker in the sale of Snap-tite. (ECF No. 42 ¶ 35). Schneider Downs worked on a commission basis, receiving expense reimbursement until the ultimate sale of Snap-tite, at which time it would receive an agreed upon commission. (ECF No. 42 ¶ 36). Schneider Downs provided many services as broker, including the preparation of a confidential investment memorandum ("CIM"), contacting potential purchasers, creating a "Data Room" that potential purchasers used to conduct necessary due diligence, and overall management of the sales and marketing process. (ECF No. 42 ¶ 37). Snap-tite also engaged Scott Wornow ("Wornow") as outside legal counsel to represent it, and Wornow participated in drafting a stock purchase agreement for Snap-tite's use. (ECF No. 42 ¶¶ 38-39). Following Wornow's departure from his law firm, Lee Charles ("Charles") from the same law firm, was retained as outside legal counsel. (ECF No. 33-1 at 33, Martin Dep. 129).

Martin and other members of the Planning Committee were involved in various aspects of Snap-tite's sales effort. (ECF No. 42 ¶ 40). Martin contends, however, that his involvement in the sales effort exceeded that of both Savas and Nevins in amount, quality and importance. According to Martin, he played a significant role in the selection and decision to engage Schneider Downs, Wornow and Charles. (ECF No. 33-1 at 26-27, Martin Dep. 101-02, 105-06; ECF No. 38-1 ¶ 24). Martin claims that he provided valuable services complementing the work of Schneider Downs, including extensive revisions of the CIM, as well as gathering, organizing and presenting financial information about the company. (ECF No. 33-1 at 26, Martin Dep. at 101-04). Martin further contends that he performed extensive work in revising, editing, and

3

improving the draft stock purchase agreement prepared by Wornow. (ECF No. 33-1 at 33, Martin Dep. at 129-30).

Defendant John Clark agrees that Martin was responsible for bringing Wornow in as outside legal counsel, and that Martin also interviewed Charles. (ECF No. 33-6 at 2-3, J. Clark Dep. 8, 13). He acknowledges that Martin worked on document preparation with Wornow while Nevins did not, but indicated that Nevins was copied on all important documents. (ECF No. 33-6 at 3-4, J. Clark Dep. 14, 17).

The efforts to sell Snap-tite in 2008 failed due to the economic downturn in the United States. (ECF No. 42 ¶ 41). According to the Clarks, between 2008 and 2010 Snap-tite, through its Planning Committee, continued to position Snap-tite for sale, and ended up selling its Hose Unit. (ECF No. 42 ¶¶ 42-43). Martin claims that his efforts in readying Snap-tite for sale during this period exceeded those of the Planning Committee as a whole, and that he provided substantial assistance in the pricing of the assets of the Hose Unit, as well as negotiating with the buyer and documenting the transaction. (ECF No. 33-1 at 26-27, 30, Martin Dep. at 104-05, 117-20).

In 2010, Snap-tite increased its efforts to once again sell the company. Negotiations occurred with United Technologies, a potential buyer, but no sale was consummated. (ECF No. 42 ¶ 44). Martin contends that he provided significant assistance in dealing with United Technologies, including evaluating offers, attending meetings, and developing strategy for the sale, and that no other director, except the Clarks, played any significant role in the negotiations and analysis. (ECF No. 33-1 at 31-32, Martin Dep. 121-26).

4

Ultimately, Parker Hannifin was identified as a potential buyer of Snap-tite, and it purchased Snap-tite in April 2012. (ECF No. 42 ¶ 55). In connection with this sale, Martin states that he provided the following services to Snap-tite:

- Negotiations, tax advice, document preparation, and supervision of legal and investment banking services for the potential sale of stock to Parker Hannifin

- Extensive advice, support, and direction to counsel retained by the defendants to negotiate and complete the Stock Purchase Agreement with Parker Hannifin

- Reviewing, commenting upon, and revising all transaction documents, including the Stock Purchase Agreement ultimately used in the sale to Parker Hannifin

(ECF No. 38-1 ¶ 21(e)-(f), (k)).

Martin was initially paid $500.00 per meeting to compensate him for his service on the Board. (ECF No. 41 ¶ 9). Martin's compensation for serving on the Board increased to a flat fee of $32,000 per year, although the parties dispute the date this increase occurred. (ECF No. 42 ¶ 10). In addition to his Board service fee, Martin received other payments from Snap-tite over the years, the nature of which the parties dispute. According to Martin, he received payments from Snap-tite for consulting work he performed, above and beyond any services he provided as a director. (ECF No. 33-1 at 36-39, Martin Dep. 141-53). Each year between 2005 and 2008, Martin would inform one of the Clarks about what he believed to be the amount Snap-tite owed him for the work he performed the previous year, the Clarks would agree to this amount, and Snap-tite would pay him in the succeeding year. (ECF No. 42 ¶ 15).

Snap-tite paid Martin an average of $107,625 per year for work performed from 2005 through November 2008. (ECF No. 42 ¶ 18). This average includes $75,000 that Martin was paid in 2009 for work performed during 2008 as part of his specific sales efforts. (ECF No. 43 ¶

5

10). Specifically, Martin was paid the following amounts according the 1099 Forms provided to him by Snap-tite:

    2005: $120,833.35

    2006: $109,333.35

    2007: $93,333.35

    2008: $107,000.04

(ECF No. 38-1 ¶ 13).

It is undisputed that after March 2009, Martin received only $32,000 per year for his Board service. (ECF No. 42 ¶ 20). Martin contends that between December 2008 and April 2012, he spent roughly 2,000 hours working on Snap-tite projects. (ECF No. 38-1 ¶ 22). According to Martin, just prior to Thanksgiving of 2011, he informed the Clarks that he believed he was owed additional compensation for the services he provided since 2009 in preparing Snap-tite for sale. (ECF No. 33-1 at 41, Martin Dep. 163-64). Martin stated that he informed the Clarks that he thought he "should be paid some more money" and mentioned a couple of "special contributions" that he felt made the deal a "lot better for everybody." (ECF No. 41 at 41, Martin Dep. 164). Martin did not request a specific amount, however, and acknowledged that he "had no number in mind at that time." (ECF No. 33-1 at 42, Martin Dep. at 166). Martin indicated that the Clarks did not "say much about it," other than stating he had done a great job. (ECF No. 33-1 at 41, Martin Dep. 164).

In March 2012, Martin sent the Clarks the following letter:

> I believe that I am entitled to a bonus because of my contributions to enhancing shareholder value. I have never raised this issue before because it is only now that Snap-tite shareholders are actually going to realize value for their shares.
>
> I feel that I have made two major contributions. First, I was a key to Snap-tite being able to acquire Autoclave. The sale of Autoclave was "rigged" to limit

competition to the offer of the management group. Parker, Shwaglock, and other likely prospects, never learned of Autoclave's sale. I learned of it, alerted your father, and got Tom Doolan at National City to issue a letter supporting Snap-tite's ability to finance the purchase. My relations with the Levinson's, and bringing Joe Allison on our team, contributed to Snap-tite's ability to beat out the management group.

Second, I was the one who thought to combine the reduced value of Snap-tite's stock in your father's estate with the availability of the life insurance case value and the on-going premium cost, to put Snap-tite in a position to redeem the estate's stock, and eventually the other stock under the option plan.

Without these two contributions, Snap-tite's shareholders would be only able to realize several thousand dollars per share for their stock rather than the $11,000 per share realized in the sale price and liquidating dividends over the last several years.

There were other contributions I made toward the eventual price realization, such as insisting on emphasizing Snap-tite's continued growth from 2008 in the CIM executive summary instead of ignoring it, or burying it on page 42, and pressing to eliminate the unfunded pension liability as a long term debt, that added millions to the eventual price realized.

This leads me to the harder part—putting a dollar amount for my contributions. This is awkward for me to press my own advantage while reducing the advantage for the Clark family. As you know, I have spent over 50 years advocating and planning for the Clark family interest.

I came up with an amount of $300 per share, which results in a substantial reward to me in recognition of my contribution to this successful effort, and is on the part of the Clark Family and other shareholders, an amount that will not impact them substantially considering that the shareholders are receiving approximately $11,000 dollars per share.

In the end, I count on your fairness and appreciation of my part in this venture.

(ECF No. 33-9).

With respect to the Autoclave transaction referred to in Martin's letter, it is undisputed that the acquisition of Autoclave occurred in 1995. (ECF No. 42 ¶ 85). Martin was Snap-tite's counsel in 1995 and represented Snap-tite in that transaction, and the Elderkin Firm was paid for the legal work Martin provided as part of that transaction. (ECF No. 42 ¶ 87). Martin was also

paid through the Elderkin Firm as the attorney for the Estate of George Clark with respect to the stock redemption. (ECF No. 42 ¶¶ 88-89). Martin claims, however, that he was never paid for the non-legal business consulting services he provided with respect to those transactions. (ECF No. 38-1 ¶¶ 9-10).

According to the Clarks, at no time did they agree to pay or enter into any contractual arrangement whereby they agreed to pay Martin a bonus or other compensation for consulting work performed by him between 2009 and 2012. (ECF No. 33-4 ¶ 26; ECF No. 33-5 at 20, G. Clark Dep. at 80). The only compensation Snap-tite agreed to pay Martin was $32,000 per year for his Board service, which included his work on the Planning Committee. (ECF No. 33-4 ¶¶ 11-12, 18-19, 23, 26). The Clarks are of the view that Martin did not put forth any more effort than any other director with respect to Snap-tite's sales efforts, and do not believe that Martin did anything beyond what he was already being compensated for as a Board member. (ECF No. 33-5 at 20, G. Clark Dep. 77-78).

The Clarks contend that Nevins was considerably more involved than Martin in readying Snap-tite for sale. (ECF No. 40-1 ¶ 13). According to the Clarks, Nevins led the due diligence with the Irish auditors and assisted the environmental experts who traveled to Ireland. (ECF No. 40-1 ¶ 11). Charles indicated that Nevins provided valuable insight involving Snap-tite's Irish subsidiary and attended a meeting in Erie while Martin did not. (ECF No. 40-2 ¶¶ 5, 8-9).

The Clarks assert that any non-Board service payments Martin received from Snap-tite between 2005 and 2008 were either for legal services Martin provided while at the Elderkin Firm, or for specific legal work performed for Snap-tite shortly after he retired. (ECF No. 33-4 ¶ 10, ECF No. 33-5 at 17, G. Clark Dep. 67-68). The Clarks maintain that these payments were spread out over time pursuant to Martin's request. (ECF No. 33-5 at 18, G. Clark Dep. 69).

With respect to the $75,000 payment made to Martin in early 2009, the Clarks acknowledge that it was not for legal services or a Board fee. (ECF No. 33-6 at 8, J. Clark Dep. 35). The Clarks state that in late 2008, Martin requested $75,000 for work he had performed during that year as part of his specific sales efforts. (ECF No. 43 ¶ 10). The Clarks indicated that "[w]hile [they] were under no obligation to do so," they agreed to make this "one-time payment." (ECF No. 43 ¶ 10).

Based upon the preceding events, Martin filed the instant lawsuit on July 19, 2012, asserting a breach of an express contract (Count I)[3], or, alternatively, a breach of an implied contract (Count II), seeking consulting fees in the amount of $1,640,000. (ECF No. 7 ¶¶ 36-47). Martin also alternatively asserts an unjust enrichment claim (Count III) measured by the value of consulting services rendered by him in the amount of $1,640,000. (ECF No. 7 ¶¶ 48-56). Finally, Martin asserts an unjust enrichment claim (Count IV) based on the increase in value of Snap-tite's stock at the time of its sale in the amount of $4,000,000. (ECF No. 7 ¶¶ 57-68).

Presently pending before the court is the Clarks' motion for summary judgment. (ECF No. 31). A supporting brief, concise statement of material facts, appendices, counter statement of material facts, a reply brief and a combined statement of material facts were also filed by the parties. (ECF Nos. 32-33, 37-40, 42). Accordingly, the matter is ripe for disposition.

### III. Standard of Review

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as

---

[3] Martin concedes that the summary judgment evidence does not establish a written contract and does not object to the dismissal of this claim set forth at Count I of his amended complaint. (ECF No. 37 at 4). Accordingly, this claim will be dismissed and will not be discussed any further in this memorandum opinion.

to any material fact and the movant is entitled to judgment as a matter of law. The
court should state on the record the reasons for granting or denying the motion.
….

**(c) Procedures.**

**(1) *Supporting Factual Positions*.** A party asserting that a fact cannot be or is
genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions,
documents, electronically stored information, affidavits or declarations,
stipulations (including those made for purposes of the motion only), admissions,
interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a
genuine dispute, or that an adverse party cannot produce admissible evidence to
support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B). The Third Circuit Court of Appeals has stated:

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary
judgment, after adequate time for discovery and upon motion, against a party who
fails to make a showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will bear the burden of proof
at trial.

*Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007) (quoting *Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *see Doe v.

Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a

reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the

non-moving party in light of his burden of proof.") (citing *Anderson*, 477 U.S. at 248; *Celotex

Corp.*, 477 U.S. at 322-23).

[W]hen the moving party has carried its burden under Rule 56(c), its opponent
must do more than simply show that there is some metaphysical doubt as to the
material facts…. Where the record taken as a whole could not lead a rational trier
of fact to find for the nonmoving party, there is no 'genuine dispute' for trial.

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The court must rely on the substantive law to identify which facts are material. *Abington Friends Sch.*, 480 F.3d at 256 (citing *Anderson*, 477 U.S. at 248).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party, and must draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. *Doe v. Cnty. of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001); *see Woodside v. Sch. Dist of Phila. Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998).

## IV. Discussion

In moving for summary judgment, the Clarks argue that Martin failed to establish an implied contract or an unjust enrichment claim.

### A. Implied Contract Claim

Martin claims that an implied contract in fact existed between Snap-tite and him in which Snap-tite was obligated to pay him $1,640,000 at the time of Snap-tite's sale to Parker Hannifin for consulting services he provided between December 2008 and April 2012. (ECF No. 7 ¶¶ 41-47). "The elements necessary to form an implied in fact contract are identical to those required for an express agreement." *Brunwasser v. United States*, Civil Action No. 07-00385, 2008 WL 5216253 at *4 (W.D.Pa. Dec. 11, 2008). The elements are: "'(1) the existence of a contract, including its essential terms, (2) a breach of duty imposed by the contract[,] and (3) resultant damages.'" *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates*

11

*Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super Ct. 1999)); *Sullivan v. Chartwell Inv. Partners*, 873 A.2d 710, 716 (Pa. Super. Ct. 2005). An implied contract has been described in this fashion:

> "'A contract, implied in fact, is an actual contract which arises where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from their acts in the light of the surrounding circumstances. *Cameron v. Eynon*, 332 Pa. 529, 3 A.2d 423 (1939).' *Home Protection Building & Loan Association Case*, 143 Pa. Super. 96, 98, 17 A.2d 755, 756 (1941). An implied contract is an agreement which legitimately can be inferred from the intention of the parties as evidenced by the circumstances and 'the ordinary course of dealing and the common understanding of men.' *Hertzog v. Hertzog*, 29 Pa. 465, 468 (1857)."

*Stephan v. Waldron Elec. Heating and Cooling LLC*, 100 A.3d 660, 668-69 (Pa. Super. Ct. 2014)(quoting *Martin v. Little, Brown and Co.*, 450 A.2d 984, 987 (Pa. Super. Ct. 1981)); *see Baer v. Chase*, 392 F.3d 609, 616 (3d Cir. 2004).

The Clarks argue that summary judgment is appropriate since Martin failed to establish a material issue of fact upon which a reasonable jury could conclude that through the parties' conduct Snap-tite agreed to pay Martin $1,640,000 in consulting fees. The court need not inquire into the particulars about whether Martin came forward with sufficient evidence in this regard, however, because the Clarks' final argument is dispositive of Martin's claim.

The Clarks argue that the existence of the express contract between the parties for Martin's Board service precludes the existence of an implied contract for the same services. *Baer*, 392 F.3d at 616-17 (citing *In re Penn. Cent. Transp. Co.*, 831 F.2d 1221, 1229-30 (3d Cir. 1987)). As stated by the court in *Brunwasser*:

> If there is an express contract, there cannot be an implied in fact contract that covers the same subject matter. *Baer*, 392 F.3d at 616-17 (citing *In re Penn*, 831 F.2d at 1229-30; and *Klebe v. United States*, 263 U.S. 188, 191-92, 44 S.Ct. 58, 68 L.Ed. 244 (1923)); *Feldman v. Google, Inc.*, 513 F.Supp.2d 229, 236 (E.D.Pa.2007). That is, the theories of express contract and implied in fact contract are mutually exclusive. *Baer*, 392 F.3d at 617. However, the existence

> of an express contract between the parties does not preclude the existence of an implied contract if the implied contract is distinct from the express one. *Baer*, 392 F.3d at 617 (citing *Atlas Corp. v. United States*, 895 F.2d 745, 754-44 (Fed.Cir.1990)). These two types of contracts may coexist only if the terms are different in some form. *Baer*, 392 F.3d at 617. <u>In other words, the implied contract must be entirely unrelated to the express contract</u>. *Id.*

*Brunwasser*, 2008 WL 5216253, at *5 (emphasis added); *see Grimm v. Discover Fin. Servs.*, Civil Actions Nos. 08-747, 08-832, 2008 WL 4821695, at *10 (W.D.Pa. Nov. 4, 2008) ("To be valid, an implied contract must be '*entirely* unrelated to the express contract.'") (quoting *Klebe v. United States*, 263 U.S. 188, 191-92 (1923)). The critical question is whether Martin demonstrated a genuine factual dispute with respect to whether the alleged consulting services he provided for Snap-tite were unrelated and distinct from his Board service for which he was already compensated.

It is undisputed that Martin was a member of Snap-tite's Board and was paid $32,000 per year for his services on the Board. It is further undisputed that as part of his Board service, Martin was a member of the Planning Committee since the mid-2000s. All parties agree the Planning Committee was created solely to address the effort to sell Snap-tite. (ECF No. 42 ¶ 31). "The goal of the Long Range Planning Committee was to sharpen up Snap-tite for eventual sale." (ECF No. 42 ¶ 31). Martin agrees that as part of his service on the Planning Committee, he engaged in actions aimed at selling Snap-tite. (ECF No. 42 at ¶ 33). Martin concedes that his efforts on the Planning Committee were an integral part of his Board service:

> Q. … Service on the Long Range Planning Committee, did that involve any additional compensation to – let's start to you. Were you paid anything extra for being on that committee?
>
> A. I don't think – no. I considered that as part of being on the board.

13

Q. And do you know whether David Nevins or Zack Savas were paid anything extra?

A. I don't think they were.

(ECF No. 42 ¶ 34).

Viewing the evidence in the light most favorable to Martin, it is clear that the services he alleges he provided pursuant to an implied contract are unquestionably similar to the services he provided as a member of the Snap-tite Board and its Planning Committee. For example, Martin states he performed the following duties as a consultant:

> a. Advising Snap-tite about ways to maximize the value of the company, so the Clarks, as majority shareholders, could achieve the highest sale price possible. This advice included the financial, management, structural, and operational aspects of the company;
>
> b. Negotiations, tax advice, and document preparation for the sale of a Snap-tite subsidiary, Snap-tite Hose;
>
> c. Negotiations, tax advice, document preparation, and supervision of legal and investment banking services for the potential sale of Snap-tite's assets to United Technologies;
>
> d. Identification of other potential buyers after the unsuccessful negotiations with United Technologies;
>
> e. Negotiations, tax advice, document preparation, and supervision of legal and investment banking services for the potential sale of stock to Parker Hannifin;
>
> f. Extensive advice, support, and direction to counsel retained by the defendants to negotiate and complete the Stock Purchase Agreement with Parker Hannifin;
>
> g. Conducting the search for, and due diligence on, legal services for the marketing and sale of the company;
>
> h. Extensive work on the confidential investment memorandum used to market the company;

14

i. Extensive work on gathering, organizing, and presenting financial information about the company necessary for its marketing and sale;

j. Attending meetings with potential purchasers; and

k. Reviewing, commenting upon, and revising all transaction documents, including the Stock Purchase Agreement ultimately used in the sale to Parker Hannifin.

(ECF No. 38-1 ¶ 21).[4] No reasonable jury could find these duties were entirely unrelated to or distinct from the actions aimed at selling Snap-tite.

Both parties dispute the scope or extent of Martin's work on the Planning Committee in preparing Snap-tite for sale. Martin contends that he spent an extensive amount of time over and above what Nevins or Savas spent, pointing to time entries in Charles' bills, which reflect that Charles consulted with him on a number of occasions. (ECF No. 38-2). The Clarks, however, are of the view that Martin spent no more time on the sale of Snap-tite than any other outside director, and claim that Nevins was actually more involved in Snap-tite's sales efforts than Martin. (ECF No. 40-1 ¶¶13-14; ECF No. 44 at 2, J. Clark Dep. 10). This dispute is not material, however, since whether Martin provided more extensive services than his colleagues on the Board or Planning Committee does not render his service unrelated or distinct. *See e.g. Baer*, 392 F. 3d at 618 ("The alleged implied-in-fact contract completely mirrors the acknowledged express contract's subject matter."); *L.P. Consulting Group, Inc. v. United States*, 66 Fed. Cl.

---

[4]Similarly, the Clarks state that Martin performed the following duties:
    a. Participated in strategy discussions via Board meetings, Planning Committee meetings, telephone conferences and emails;
    b. Reviewed and revised the CIM;
    c. Reviewed the Stock Purchase Agreement;
    d. Participated in the telephone interview of Charles with Gary Clark;
    e. Located and secured the services of Wornow;
    f. Worked with Wornow on some documents relating to the sale of Snap-tite; and
    g. Interviewed and had input into the retention of Schneider Downs.

(ECF No. 33-6 at 3, J. Clark Dep. 13-17; ECF No. 44 at 2, J. Clark Dep. 9-12; ECF No. 33-4 ¶¶ 11-12, 18-19, 23).

238, 242 (2005) (rejecting claim that alleged implied contract work orders that involved specific work within the general description of work performed did not involve a different subject matter, noting that "[t]o rule otherwise would be to eviscerate the principle that an implied-in-fact contract must be 'entirely unrelated' to an express contract[.]"); *ITT Fed. Support Servs., Inc. v. United States*, 531 F.2d 522, 528 n.12 (Cl. Ct. 976) ("The implied contract, if it is to be valid, must be entirely unrelated to the express contract."). Plaintiff's claim that he is entitled to more compensation does not transform the express contract into an implied contract unrelated to his Board service. *See e.g. Atlas Corp. v. United States*, 895 F.2d 745, 755 (Fed. Cir. 1990) (holding that where express contract's price was set, there can be no implied agreement to pay over and above those prices since costs were not "entirely unrelated" to the costs included in the contract prices).

In sum, Martin did not point to any facts from which a reasonable jury could conclude that the services he provided Snap-tite in readying the company for sale were in any way unrelated to his duties as a Board member or as a member of the Planning Committee.[5] Accordingly, summary judgment will be granted in the Clarks' favor with respect to Count II of Martin's amended complaint.

B. *Unjust Enrichment Claims*

Martin alternatively asserts claims for unjust enrichment. He seeks $1,640,000 for the consulting services he allegedly provided Snap-tite between December 2008 and 2013. He further seeks $4 million for services he provided that allegedly increased the amount realized by

---

[5] Martin finds it significant that he was paid more than $32,000 between 2005 and 2008. Martin did not, however, plead or argue that the express contract for his Board service was modified or amended such that a different contract for his Board services came into being. Martin insists that there are two separate contracts at issue: one for his Board service for which he was paid $32,000 per year and one for his consulting services for which he has not been paid since 2009. Thus, while Martin was paid more than $32,000 for some years does not advance his implied contract claim.

Snap-tite's shareholders upon the stock sale to Parker Hannifin. In order to prevail on his unjust enrichment claims, Martin must demonstrate the following elements: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation of such benefit by the defendant; and (3) acceptance and retention of such benefit under circumstances such that it would be inequitable for the defendant to retain the benefit without payment to the plaintiff. *EBC, Inc. v. Clark Bldg. Systems, Inc.*, 618 F.3d 253, 273 (3d Cir. 2010) (applying Pennsylvania law); *AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. Super. Ct. 2001). "The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." *Id.* Instead, "'a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that ... would be unconscionable for her to retain.'" *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 180 (3d Cir. 2008) (quoting *Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. Super. Ct. 1985)). A claim of unjust enrichment does not apply, however, where an express contract exists. *Premier Payments Online, Inc. v. Payment Systems Worldwide*, 848 F. Supp. 2d 513, 527 (E.D.Pa. 2012) (citing *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987)); *see Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. Ct. 2006) ("By its nature, the doctrine of quasicontract, or unjust enrichment, is inapplicable where a written or express contract exists.").

Martin's contention that he is entitled, under an unjust enrichment theory, to payment for services performed in connection with readying Snap-tite for sale, as well as the increased value of Snap-tite's stock at the time of the sale, is unavailing. As discussed in connection with Martin's implied contract claim, it is undisputed that he was paid $32,000 per year for his Board service pursuant to an express contract, which encompassed his service on the Planning

Committee, whose sole duty was to prepare Snap-tite for sale. It is undisputed that Martin was Snap-tite's counsel in 1995 and represented Snap-tite in connection with the Autoclave transaction, and the Elderkin Firm was paid for the legal work Martin provided as part of that transaction. Martin was also paid through the Elderkin Firm as the attorney for the Estate of George Clark with respect to the stock redemption. (ECF No. 42 ¶¶ 88-89).

Martin is not entitled to an additional amount in compensation for his alleged consulting services or as a bonus for his efforts in increasing the value of Snap-tite stock when it sold to Parker Hannifin. Similar arguments were rejected by the courts in *Ankerstjerne v. Schlumberger, Ltd.*, 155 F. App'x 48 (3d Cir. 2005), and *Kia v. Imaging Sciences Int'l, Inc.*, 735 F. Supp. 2d 256 (E.D.Pa. 2010). In *Ankerstjerne*, the plaintiff was employed by the defendant and was paid performance-based bonuses in 2001 pursuant to a written contract that expired on December 31, 2001. *Id.* at 49. A replacement bonus plan was not implemented until October 2002. *Id.* at 50. The plaintiff in *Ankerstjerne* sought a bonus for work performed by him from January 1, 2002 through October 2002, arguing that an implied contract existed between the parties covering the period between January and October 2002. *Id.* The Third Circuit Court of Appeals rejected this argument, noting that the plain language of the written contract applied only to work performed in 2001 and not 2002. *Id.*

With respect to the unjust enrichment claim, the plaintiff in *Ankerstjerne* argued that it was unconscionable that his supervisor promised to pay him pursuant to the expired plan, induced him to work on projects as a result, and then failed to pay him as promised. *Id.* at 52. The court rejected this argument, noting that the plaintiff was still paid for the work he performed in 2002 at his base salary, which was not inconsistent with the bonus plan. *Id.* In affirming the entry of summary judgment, the Third Circuit Court of Appeals agreed with the

district court that the "plaintiff has not shown that he provided the defendants with anything more than the work he was hired to do." *Id.* (citing *Herbst v. Gen. Accident Ins., Co.*, No. Civ. A. 97-8085, 1999 WL 820194, at *9 (E.D.Pa. Sept. 30, 1999) (denying claim for unjust enrichment where "[p]laintiff has not shown that he did anything more than work to the best of his abilities for defendant as he was engaged to do")).

Similarly, in *Kia,* the plaintiff was hired at a set salary, but claimed that he was told during hiring negotiations that his compensation would be increased when the company became more profitable and that he would be compensated on "par" with the company's owners. *Kia*, 735 F. Supp. 2d at 262-63. The company subsequently was sold, and the plaintiff was dissatisfied with the bonus he received, believing that he should have shared equally in the proceeds received by the five owners from the sale. *Id.* at 264. The plaintiff in *Kia* filed a lawsuit asserting, *inter alia*, an unjust enrichment claim seeking damages in an amount equal to the increased value of the company's stock during his employment. *Id.* at 264-65. In rejecting this claim, the court reasoned:

> As noted above, a plaintiff cannot recover under an unjust enrichment theory where a contract exists between the parties. Thus, Kia's claim presupposes the jury's rejecting the existence of the alleged oral contract between Kia and ISI under which ISI promised him a share of the increased value of the company in exchange for his accepting employment. However, in the absence of this contract, Kia could have no expectation that he would be provided any of the proceeds from the sale of ISI. Indeed, Kia "has not shown that he provided the defendants with anything more than the work he was hired to do." *Ankerstjerne*, 2004 WL 1068806, at *7; *see also Herbst v. Gen. Accident Ins. Co.*, No. 97-8085, 1999 WL 820194, at *9 (E.D.Pa. Sept. 30, 1999). That his work may have indirectly contributed to the profits realized by ISI's owners upon the sale of the company does not give Kia a legal right to share in those profits under an implied-in-law contract. We will therefore grant defendants' motion for summary judgment with respect to Count XII of the Amended Complaint.

*Kia*, 735 F. Supp. 2d at 269-70.

The court reaches the same result here. In this case all the services Martin provided to Snap-tite were in his capacity as a Board member for which he was paid, or in his capacity as an attorney with the Elderkin firm for which he was paid through the law firm. *Lackner*, 892 A.2d at 34; *Alpart v. Gen. Land Partners, Inc.*, 574 F. Supp. 2d 491, 507 (E.D.Pa. 2008) ("A plaintiff cannot recover for unjust enrichment when an express contract governs the relationship between the parties."). Like the plaintiff in *Kia*, Martin could have no expectation that he would share in the proceeds of the sale absent an express contract encompassing that expectation. Accordingly, summary judgment will be granted with respect to Martin's unjust enrichment claims asserted in Counts III and IV of the amended complaint.

**V.** **Conclusion**

Based upon the foregoing reasons, the Clarks' motion for summary judgment (ECF No. 31) will be granted.

An appropriate order will be entered.

    By the court,

    s/ Joy Flowers Conti
    Joy Flowers Conti
    Chief United States District Judge

Dated: February 27, 2015